Huh? I don't know what to talk about. No, we'll have to talk about it. I'll make my little statement also. I'll wait for him. Yeah, I'll wait. I'm going to go to sleep. Yeah, I'm going to go to sleep. Can you move the easel back? Yes, please. One minute before we begin counsel. I have a statement to make for the benefit of both counsel. Approximately 10 years ago, I sued Volvo. Now, I've not attempted to find the papers on the suit, but I believe it began in a small claims court in Berkeley and eventually in an appeal to the Alameda Superior Court. My suit was unsuccessful. It was for property damage, and it was not a rollover or a roof defect. It was some defect in the car, which I really don't remember clearly. And I have driven a Volvo probably for the last 30 years. But I imagine if I were called as a juror, that counsel of Volvo might think I was the wrong juror, but I don't want any thought of that here, and I'd be quite happy to leave the bench. My two colleagues will judge the case and get a third judge to leave the inn. So if there's any slightest sense on the part of either counsel that I should recuse myself, I will do so. Well, on behalf of the plaintiffs, Your Honor, we have no objection to Your Honor sitting. I might ask the color of the Volvo, but otherwise we don't care. Yes, sir. Your Honor, on behalf of David Graves, Your Honor, I have a Volvo, and we have no problem with you sitting here in this case. All right. Thank you. If I may then proceed, Your Honors. I'd like to reserve five minutes for rebuttal. My name is Larry Cobin. I represent the Ritchie family. And I'm tempted, only because of the discussion of the last 40 minutes, to move immediately into the issue of statistics because it's such a fascinating area, and this case also relates to it. But before doing so, I would like to address some other issues that we think are important, and then I will get to the issue of statistics as they were presented to you. We have a number of issues that we've raised, all of which in our briefs. I'm not going to cover those all. I would prefer, if I can, to just focus on a few, and actually a couple of them dovetail and include statistics in an interrelated way. The difference in this case, factually, from the last case that you heard, is that this case goes that further step. It is not a question of the stability of the vehicle, but rather what happened to Mr. Ritchie when the vehicle rolled over. It is a crash within this case, and it is under Nevada law. It is a crash within this case, and the focus was the performance and the design of the roof structure and the seat belt when a rollover occurred. And so that's a major distinction in how the statistics may or may not play into this. In this case, there is no claim that Mr. Ritchie was speeding. He was wearing his seat belt. He lost control. It went off the road. It was kind of coming home on a business trip, and he and his friends were in this vehicle. It rolled over. Unfortunately, he became quadriplegic. The other two gentlemen walked away. So what I wanted to do is focus on two specific areas. First is an area related to allegations, what I call allegations, claims, and proof issues. The first thing is this. The primary claims in the case were, under Nevada law, that the product was defective in its design and that there were misrepresentations of fact, and that, in fact, the literature that Mr. Ritchie used and relied upon that said that this had a safety cage was false, and that therefore made it defective under Nevada law because it violated consumer expectations defined by that advertisement and also that it was a misrepresentation. At the get-go, what happened was Judge Reed decided that there was an inadequate pleading of the misrepresentation slash fraud claim for compensatory damages. So we were not permitted to ask the jury to decide the claim of fraud or misrepresentation as it related to the advertisements. Judge Reed found that we were able to use those claims to prove a punitive damage claim. Now, at the time, I mean, it was kind of an oddity in that Judge Reed was looking at the pleadings and said, okay, I see in your punitive damage claim you claim this, but you didn't do it in compensatory, so you can do one and not the other. You submitted a joint pretrial conference order, correct? We did. That's right. And you helped negotiate it, I assume. We did. You're right. You didn't put in a misrepresentation claim in the pretrial conference order? No, sir. We did not. For compensatory damages. No, sir. We did not. It was not that specific. And so I'm just raising the point because of the fact that while certainly there is some things are discretionary, it made little sense. Did Judge Reed actually have a conference when he signed off on the pretrial conference order? No, I don't think so. Yes, sir. I don't think we met with Judge Reed until we went to trial. We had a pretrial with the magistrate. So, no, that did not occur. I don't mean to dwell on that, but I wanted to bring that up for a different reason, and that is that it dovetails into then what occurred when the jury was being charged and instructed on defect. And what happened was through the case, one of the primary issues that Judge Reed permitted us appropriately to deal with was the safety cage representations of the Volvo. And to show different advertisements and to then show how the engineers at Volvo considered what they considered that to mean versus what we demonstrated was the strength or the weaknesses of this roof. When it went to the jury, unfortunately, Judge Reed would not explain to the jury that in deciding whether the Nevada consumer expectation test was or was not met by this product, that it needs to account for the advertisements, that that is a primary way to judge whether or not consumer expectation is met. Instead, the judge simply said, here is the consumer expectation charge. Go and figure it out. And we specifically asked the court, based upon case law throughout the country, that that needed to be addressed in the context of the evidence, that the jury needed to have some guidance. How do we apply all this evidence to decide whether consumer expectation was or was not met? And the court refused to do that. And I submit to you that that was an abuse of discretion because the jury did not have any way to know this. They had no way to gauge it based upon that bare charge. Problematic is the fact that in response to that, the defense has said to the court, well, there are other jurisdictions where there is consumer expectation and while Nevada has nothing on it, there are others that have addressed it. Some have said yes, like Ohio and the Sixth Circuit. The advertisements are key to that analysis. They are key to it. But others, for instance, like Pennsylvania, they cited to Pennsylvania for the proposition that under Pennsylvania's law, that's not the issue. The problem is twofold. One, they cite to a Pennsylvania case which is not the correct case. They cite to a case which they say is a Supreme Court case from Pennsylvania. The defendant's name is Jackson. It is not a Supreme Court case. It is a Superior Court case. It's an intermediate appellate court. Pennsylvania has rejected the consumer expectation test. That's Lewis versus Coffin. So that relying upon that jurisdiction or that purpose is improper and incorrect. But more importantly, the problem is this. How does a jury go about deciding the consumer expectation test? Nevada law has not addressed that. There is no addressing it in Nevada law. However, those jurisdictions that have addressed it in the context of advertisements, of representations, when they are a basis for the purchase, specifically have held in the Ohio cases and the Sixth Circuit cases where it's consumer expectation and they've looked at the representations, they say this is the heart of it. This is how you judge whether or not consumer expectations have been met. And so you've got to give that guidance to the jury. It was not given. Now, let me move on then. Now, that wasn't dependent upon the judge leaving in the tort, the misrepresentation. Oh, no. Not at all, Your Honor. There was no connection. There's no connection whatsoever. I apologize. I'm trying to keep the flow moving and I should have indicated that to the Court. No, sir. They're independent. What I'm now talking about is the fact that since the consumer expectation is the test for defect, that we were permitted to present all sorts of evidence, but primarily focusing on the representations made by Volvo in documentation that Judge Reed agreed was relevant. The problem was when it got to telling the jury how to use that information, the Court refused to do that. It felt that just giving a general instruction was enough. And while one can argue, and certainly I did make the argument in my closing, but these are the representations. This is how you need to do this. The fact that the Court does not explain that, which is part of the Court's obligation, I think was critical to the analysis. Now, I must also, I want to move on, though, to the other two points, which I think are even more dramatic in the effect here. And that is these are issues that came up in defense. There are three issues, each of which I raised in motion in limine, each of which Judge Reed ruled on and, of course, ruled against me. They relate to evidence of compliance with a Federal standard, the Root Strength Standard, the admissibility and the admission of statistics as it relates to severity of rollovers, and misuse. And I want to start with misuse, if I may. Judge Reed, correctly under Nevada law, ruled pretrial that the cause of the accident was irrelevant. Let me ask you about this misuse. Yes, sir. I would have thought previously that misuse related to the use the driver was making of the car, that it would be a misuse if he used it like Evel Knievel, you know, to jump over cars, that that would be a misuse. Yes, sir. Would I understand the defense theory of misuse or unintended use is the rolling over of the car three or four times? Yes, sir. That was the position. That was the position. Are there any cases that, I mean, misuse, you would think, relates to what the driver was doing voluntarily to the car rather than the result of his proper use of the car? That the – I mean, I see the defense's theory that it was – I mean, that a car is not intended to survive ten rollovers. I can understand that. My question is, is there anything either way that tells us whether that falls within the misuse doctrine as opposed to a different, totally unrelated theory? There is no case, to my knowledge, published anywhere in this country that has ever said that if a vehicle rolls over, that is evidence of misuse. None. Now, you say the cause was excluded. Somehow I have gotten the impression, and perhaps it's just reading it in, that the driver fell asleep. Yes, sir. I suspect – I think that's right. It's exactly right. And isn't that drive a car when you're asleep is a misuse? No, sir. No, sir. And there was never such an argument. Well, but I'm asking as a matter of common sense. You told me you were going to drive a car when you were asleep. I would say it was a misuse. No, sir. Under the law in Nevada and everywhere else that I'm aware of, in the context of a products liability case, a person's contributory negligence is not misuse. Well, that's the way you phrase it. But why – if you're looking at the actual use of the car, here's someone who's asleep who's driving it. Why isn't that relevant? Sir, it is not relevant, number one, because Nevada law says that the contributory negligence of a plaintiff in causing an accident is not relevant as a defense in a products liability case. Well, that's the classification. You classify it as negligence. But I would just start with the is this a misuse of the car? No. Andrews v. Harley-Davidson says that when the driver is drunk and he's driving his motorcycle and he loses control and it goes off the road – Still not a misuse. It is not misuse. It is not contributory negligence. It is not admissible. All right. Okay. Well, all right. I understand that. I'm just saying that's the law, Your Honor. As strange as it is, that's the law. Well, yes and no. Because let me just – because this is important to understand. When you're dealing with a crash-worthiness theory where the whole issue is the enhancement of the injury, it's because – it is or it is not because of the performance of the vehicle in a crash. What caused the crash is not relevant to the enhancement question, which is the performance of the car. There was – Well, it is relevant to consumer expectations, though, isn't it?  It is and it isn't, Your Honor, because the consumer expectation is guided by what manufacturers and juries understand as foreseeable. And it is foreseeable, unfortunately, that vehicles roll over every day in this country. And so then we look at the question of the performance of the car under that circumstance. Now, in terms of the misuse, if I may, there was no evidence of speeding. No one ever claimed that Mr. Ritchie was speeding. He was wearing his seatbelt. But if he were, it really wouldn't matter, would it? I don't think it would either, Your Honor. I still don't think that's a misuse. Because I understand that of the Nevada court, and it's not unique, is that part of life is that people are going to be driving badly, driving under alcohol, falling asleep, and that when manufacturers build a car, they build that with that in mind. Yes, sir. And they're supposed to be built so that they will be safe when there is an accident. Yes, sir. Yes, sir. So one of the things you contemplate when you build a car is that people are going to speed as well as ñ now, there may be a speed at which it's so excessive that a car can't be expected to withstand that type of speed. Yes, sir. But that's not the case here. No, sir. Here, the evidence from the defense witness was that, and we all agreed, that the vehicle was going off the road somewhere in the speed limit of 70 to 80 miles an hour in that range. The vehicle slid for a distance. The defense expert agreed that when the vehicle began to roll, it was only traveling at 40 miles an hour. Their position was that because it rolled three times, that that made it a highly severe accident, ergo a misuse. And that was the basis upon which the trial judge instructed the jury on misuse, that it had rolled three times, that statistics say that most rollovers only occur one roll at most, and therefore, because there was three rolls, that was highly severe. That evidence never came in from a Volvo engineer, and I think that's significant, because the question of whether or not you submit to a jury misuse is based upon what the manufacturer can reasonably be foreseeable as a use of its product. We put in evidence of Volvo doing rollover tests. They do their own rollover tests. They were rolling the vehicle over. We had evidence of the vehicle rolling over. I realize my time, but I need to move on. You're going to want to get to the governmental standards and the comparative stuff, aren't you? Well, I just need to say this about the statistics, and I'll come back on rebuttal. What came into evidence here over objection was that this was a highly severe crash, and it's because it's top ten percent. Most vehicles roll over. Ninety percent of them are less, okay? There was no correlation with product usage. There was no correlation with how the products held up under these rolls. There was no correlation. Did that ten percent involve all people becoming quadriplegic, or did they walk away? It was just most of the statistics show that it happens with only one roll. Therefore, this is important to judge the safety of the product because it involved three rolls. That was junk science. There was no relationship to this incident. It wasn't related to Volvos. It wasn't related to on-road, off-road, how much roof trash there was. It was just thrown on the wall, and the purpose of it was to convince this jury that look at this. Most rollovers occurred less, and therefore, this is severe. My God, that's why he suffered the injury. It had nothing to do with roof crush, nothing to do with the seatbelt. And there is no way to correlate that and provide any relevant information to the jury under those circumstances. None. And yet it was put in from the get-go because our objection was overruled. 216. The defense started out at the beginning. 216 is a federal standard that says it's got to resist a certain amount of force in the roof. And it met that. It met that. But this is a consumer expectation criteria. The judge, Judge Reed, said, I agree. For consumer expectation, 216 is not relevant. But I'm going to let it in anyway. I'm going to let it in for other purposes. The problem with that was the defense took the position roof crush didn't cause this man's injury. They took the position roof crush doesn't cause injury. Under those circumstances, there was no relevancy basis to bring in 216. None whatsoever. And I'll reserve the rest if I may for rebuttal. Excuse me. May it please the Court. My name is David Graves again, and I represent the Volvo defendants. Volvo's defense in this case was primarily focused on the fact, on several facts. One, that this accident, the Subject Ritchie accident, was a very, very severe accident. And in addition to that, that the subject vehicle, this Volvo 740 sedan, performed, despite the extreme severity of the accident, very well. Meaning that there was not a lot of roof crush. In addition, we tried this case and argued this case to the jury on those facts and the evidence supporting those facts, as well as the credibility, a significant attack against the credibility of the plaintiff's experts. Changing opinions, misanalyzing how much crush there was on this vehicle, misinterpreting test reports of Volvo as to what its true roof strength was vis-a-vis various 216 type of tests. That was the focus of our evidence. That was the focus of our argument to the jury. Now, with respect to several of these plaintiffs, or excuse me, appellants, points on appeal, first of all, they all go to an issue of abuse of discretion. And I believe the record is very clear that Justice Reed clearly, on each and every one of these, did not abuse his discretion for many reasons. In addition to that, even if you assumed arguments. Well, I'm not sure they all do, really. The question, for instance, with the government standards evidence is whether it's proper. Whether one, I mean, there are two arguments. One is that the statute, through the legislative history, prohibits the introduction of the evidence. But going by that, the question of whether it is relevant in a state that is customer expectations, maybe had the judge said, well, I think that customers read the governmental standards, are familiar with it, rely on it when they buy the car, that would have been different. But the issue was in a state that does the consumer expectation, whether the argument that because we met government standards it's not defective is a proper argument. Your Honor, it depends on, I guess it depends on where you are in the country as to whether or not the court's statement was correct. That's true. And where this case was tried, and Justice Reed is very familiar with this State, he's not quite a justice, he's a judge. Excuse me, Your Honor. Just like us, we're just judges. Judge Reed. Judge Reed, very familiar, of course, with the state law where this case was tried, and very familiar with the fact that the case of Robinson versus CCG, which is the Nevada Supreme Court, and it's right on point, I don't think there was any question, and I don't think Justice Reed had any difficulty in arriving at this decision at the motion and limine stage. This decision, again, in 1991, I'll just read a couple of excerpts, I think these are in our briefs, but I believe this first excerpt is probably from page 526 of the Pacific Second Cite, that the legislative or administrative regulatory standards are admissible as evidence of a product's safety. That's what we're talking about. This is an administrative standard. There is, I believe it's on the same page, I don't think it's a different page, but they go on, they make reference to a case, Seaward versus Griffin, which is an Illinois case, and they talk about the federal motor vehicle safety standards in an analogy. They say in Seaward, the trial court admitted federal motor vehicle safety standards, even though some were newer than the vehicle. So they were talking about, in that case, favorably with respect to standards that are enacted, even after the date of manufacture of the vehicle. I think there is no question under this case that not only the 216, any test done on 216, but also there was an issue in the appellant's brief dealing with comparative 216 numbers and strength to weight ratios, much of which they introduced during their case in chief, not through Pross and not through, only in the defendant's case. But this Robinson case cites favorably. It concludes saying, quote, The best way to determine if a defendant should have built a safer product is to let the jury hear all the evidence relating to the course of conduct of both the industry and the particular manufacturer. That's what both the plaintiffs did in this case, and that's what the defense did in cross-examination and in putting in certain test reports. In addition, this case was tried to this jury on punitive damages, and this is certainly relevant evidence on punitive damages. And if the plaintiffs wanted some instruction, I thought they were entitled to some instruction to separate to the jury what they thought was evidence only relevant on a compensatory damage issue versus punitive damage. They had every right to submit such an instruction, and they did not on this particular issue that we're talking about. So I think with respect to the 216 issues, as I've mentioned, Your Honor, that Judge Reed, there is no abuse of discretion. That's the way cases are tried in this State. Is it correct that Robinson was a state-of-the-art case and state-of-the-art was the defense there? Well, Your Honor, I don't think state-of-the-art – sure, state-of-the-art was involved in that case. So was regulatory standards. And what I just read was the holding of that court with respect to the applicability of administrative and regulatory standards. I mean, that isn't the dicta of the case, and that was in the context of ANSI standards, not a motor vehicle. But, again, certainly in dicta of the case, as I read, they made reference to federal motor vehicle safety standards in an approving manner. And I don't think there's any real distinction between state-of-the-art and state-of-the-industry. That's a blurred, I think, a disingenuous distinction, if that's the distinction that the plaintiffs were trying – the appellants were trying to make here, Your Honor. With respect to – I'd like to address this issue, this misuse issue, and some of the questions that I just listened to between the panel and Mr. Colvin. And, first of all, what Judge Reed did with this instruction was he gave the Nevada standard instruction. He gave the Nevada standard instruction on defect, and there was three of them, including consumer expectation. And he gave two instructions, Nevada standard instruction, verbatim, with respect to this misuse issue. It has to be some evidence to support the instruction. So what's the evidence of misuse here? The evidence of misuse here – and, again, we have to start out thinking this is crash-worthiness case. And, yes, there was – there is – a lot of common sense tells us what misuse – if it's misuse of the driver, yes. Is it misuse – is it misuse simply because the vehicle – Isn't that what misuse is? It would mean to the normal person, to the juror. If the driver took the car and deliberately rolled it over three or four times for some purpose to make a movie, you would say that's a misuse. We didn't build a car for that purpose to be used that way. That's what I would have thought misuse was. I think that certainly is part of it, and I don't think there's any question about that. And certainly the Harley-Davidson decision in the state of Nevada addresses a certain aspect of misuse in terms of intoxication, and we did not argue that nor disagree with that. And part of the – one of the focuses of that – or part of that decision that the Nevada Supreme Court, with respect to the Harley-Davidson case, made a reference to the fact that, well, people who drive unfortunately intoxicated is not a rare event. So, therefore, it is reasonably foreseeable. But now – Let me ask you this. If I'm driving a car down the road at 20 miles an hour, and two trucks barrel into me, one from each side, at 100 miles an hour, is that a misuse? I think that there's an inference that you can argue that it is and that that instruction should be given. I think that in a crashworthiness case, and now that's where I was going and that's where this Court's question is directed, in a crashworthiness context, there has to become some set of facts where this accident is no longer reasonably foreseeable. The test and the definition of misuse is not foreseeable. I'm sorry. Excuse me. How could that be a misuse by the driver in Judge Reinhardt's hypothetical? Excuse me. How could it possibly be a misuse by the driver in the hypothetical that Judge Reinhardt – Of the two vehicles coming together at 100 miles an hour? It is not. But the question and the focus in a crashworthiness is the product. And the question is, is it reasonably foreseeable? There's a severity of a crash that a manufacturer no longer has responsibility for under reasonable foreseeability. When I asked your opponent about it, I said I thought there were two different issues or problems. And they may be questions whether you've combined them into one. One is a misuse. Another is your argument is a perfectly legitimate argument. The product cannot reasonably be expected to be built to survive what happened to it in this accident. The question is, is that the same as misuse? And if it's not misuse, the problem is what does the juror think when the judge tells him, you know, they have a defense here. There's enough evidence to show that this car was misused. Not that the accident is so severe that you can't expect the manufacturer. I think the answer to that, Your Honor, is that when you – is the way misuse is defined in the State of Nevada. And when you look at the two instructions that were given, and the two instructions made it absolutely clear that all it means by this is reasonable foreseeability. And frankly, if you read the instructions, they're almost more favorable to the plaintiffs than they were to the defendant, because they say several times that if what's going on here is reasonably foreseeable, then it's not a misuse. And that was repeated, I believe, in both of those instructions. And so the focus here is, one, it's a correct statement of the law. And as it applies in the crashworthiness context of a product, yes, there was evidence here. Now, the court may not agree that there was sufficient evidence for the jury to so find that this was a misuse of the product in a crashworthiness sense that the jury may have found that it was a reasonable foreseeable accident in those circumstances. But there was evidence of that, and therefore, the instruction to be given, I think, was proper. Lastly, on that, on that, on this very issue, the question is, again, one, it's a proper instruction by Judge Reed because it is the law in the State of Nevada. And number two, if he shouldn't have given it, if that's what this Court thinks, is there prejudicial error here? I didn't argue this in close, Your Honor. I didn't argue this at all in close. You will not find the word misuse. You will not find the word abuse in closing argument. The whole focus of the closing argument was what I as I started out in this argument here, and that's why I wanted the Court to understand what our focus was. Mr. Coburn in his close addressed the issue of misuse, and Mr. Coburn in his close made it clear to the members of the jury that of all the evidence of why a vehicle rolling over would not be misused, and I didn't respond to that. The only thing I said that came close to that is about six lines towards the end of my closing argument, which was, if I recall, was at least an hour and a half or maybe even two-hour closing argument. There's about six lines towards the end where I make reference to the concept of reasonable foreseeability, and I made it in that reference in context with the three instructions on defect where the term reasonable foreseeability appears. I didn't even make it in reference to the misuse instruction. So I don't think in the context of this case, I think wherever the Court goes on this issue of misuse, there is no prejudicial error here. There's simply no record for that, that there is ample support for a finding of no defect as this jury found in this case and in a unanimous way. And, again, there was no emphasis, not even the mention of the word use or misuse in closing argument by myself. Coming back to the opening argument, you talk about the plaintiff's claim being a vehicle at 345 in the morning on I-15 going 70 to 80 miles an hour, no skid marks, goes right off the road, travels 500 feet. That sort of suggests to the jury that maybe there's something a little odd about this accident. They're late, early in the morning, going and speeding, no skid marks, going off the road. That sort of, at the very beginning, alerts the jury what was it that really caused this accident. I mean, the problem with the misuse is it does focus your attention on the driver's conduct rather than the crash-worthiness of the car. There was no argument that any conduct by Mr. Ritchie was in any way a defense to this, to the case against Volvo. That was never argued. There was a motion in limine on that. It was adhered to religiously throughout this whole trial all the way up through closing argument, Your Honor. Those facts that you recited are relevant facts, many of which I think were stipulated to between the parties. So I want to jump back to a couple of the things that were mentioned by Mr. Kogan here this morning with respect to this. I'm trying to remember from my notes here. But, oh, he talked about the charge that Judge Reed gave with respect to consumer expectation and the complaint that it didn't include some additional language dealing with the issue of advertising. And on that issue, again, number one, the instruction, again, is simply the Nevada standard jury instruction. Number two, Judge Reed said this evidence is admissible, told Mr. Kogan that, and it's admissible for him to argue under the consumer expectation rule in the state of Nevada. And it happens all the time. When you try cases and you get up and argue a case before a jury, many times it's up to the lawyer to explain to the members of the jury how pieces of evidence fit in to the instructions in the court. Oh, he did do it. In his closing argument, he said that he did do it. He did do it. So I don't think that there's any, there's no abuse of discretion with respect to the consumer expectation charge and the denial of the additional language that Mr. Kogan wanted, not taken from any case from the state of Nevada, but taken apparently from cases from other jurisdictions. And where Judge Reed gives the standard instruction and tells Mr. Kogan that he can argue these things, I think there is no error on that issue. With respect to the negligent misrepresentation and the fraud, just one quick thing there. I believe, if my recollection is correct, on their motion for new trial, they did not complain about the fraud. So to now bring up the fraud under a compensatory theory, that was not, I believe, raised. I believe that's correct with respect to their motion for new trial and therefore should not be before the court at this juncture. They did raise it before the trial started, though, didn't they? Yes. Yes. The motions in limine, they raised it and there is a link there. I raised it, frankly, when we got to, when we started the motion in limine, and the first, I think, motion that Judge Reed was going to hear argument on was advertising. And I interjected before we get into that, because we saw their response brief to that motion all of a sudden for the first time saying in that brief, well, we've got a negligent misrepresentation, negligent testing, et cetera, et cetera. And interestingly, if you read through the transcript of that argument, you'd find that in an earlier, or in response to another motion that the plaintiffs had filed, they said there was no negligence. In the motion to keep out Mr. Ritchie's fault in this accident, they said we're making no negligence claims. Because if they did make a negligence claim, then we're at the comparative fault with respect to Mr. Ritchie, and some of that would have been relevant. So in their brief, they talk about, well, we shouldn't have been surprised. And maybe we'll hear that in a moment from Mr. Coburn. I did say during the argument on the motions in limine that I thought Volvo would be significantly prejudiced. And there was no need for me to elaborate, but those words were there. And we never, during the course of this trial, impliedly or expressly in any way suggested that we wanted to try these issues. And why did I say that? Negligent misrepresentation, and just as an aside, I would tell the court that I'm in the middle of a two-month trial now in Stockton, California, and we're dark this week, and that's why I am here. It's a different client. It's a Toyota. It's a rollover case. There is a negligence claim, and there is advertising issues. And we have experts. We have experts on that issue, marketing experts dealing with that issue. The rules are set up for notice so we can defend this case, and that's why I said that.    And if we were to have a misrepresentation, if we were going to amend the discovery, if they were going to amend the complaint, that was the deadline in our pre-trial order. And so we're going to let them argue, for purposes of punitive damages, misrepresentation for purposes of punitive damages. No. That would be negligent. Not negligent. No, not negligent. But fraud.  Fraud. Because they did in their can – yes, Your Honor. They were allowed to include – or they had included a punitive damage claim, and that was in the second – excuse me, their first amended complaint, Town 2. Tactically, we felt, and I think is borne out given the trial of this case, that we weren't really concerned about punitive damages, Your Honor. We didn't think there was anything, any evidence here that we're concerned about, that we would – this product performed well, that the testing that Volvo did would support that. They did have a test where they put – I forget the numbers now, and I made a mistake in opening. I called it too many tons. But I think it was 20,000 pounds, if my memory is correct. It's in the record. That they put vertically down on this roof to support some of the advertising that they did. We felt confident that we would not have a problem with punitive damages. When you get into issues of negligent advertisement and what someone should be relying upon or did or did not with respect to seeing advertising, that gets into a little different area. That was not part of, I believe, the punitive damage count was negligent misrepresentation. It was fraud and deceit and – I can't recite all three of them off the top of my head, Your Honor, but it wasn't negligent misrepresentation. I see I have about a minute left here. And with respect to – we talked about misuse. Statistics, let me just quickly focus on that in this last minute and a half. The statistic was simply how frequency on a cumulative basis are each quarter of a turn roll. One accident, a car turns 90 degrees. Well, that may be 20 percent of all the single vehicle non-collision accidents on the road. In a rollover case, there is no one agreed upon measure of severity. If we talked about the analogy of a frontal impact, it's easy for late people as well as experts to talk about, well, 50 miles an hour, 100 miles an hour. A rollover is not a rollover is not a rollover. Every one is different. Where does it hit? How hard does it hit? How high is it coming down? How fast is it spinning? What is the amount of energy or speed when it's lifted off compared to what people reasonably test at? That's that 30 miles an hour versus this we think lifted at 40. That meant it involved 80 percent more energy to do bad things. The experts in rollovers say there is no one measure of severity. So there's various things we put into evidence, a whole bunch of parameters, these statistics being one of them. The argument with respect to going back to the foreseeability was a severity argument, not just the statistical argument. The statistical argument was a basis for the fact that this vehicle we thought was a severe accident. So that's the context of that. They introduced it. Mr. Burton or Dr. Burton, I should say, during direct testimony on December 18, 2002, on page 115 and 116, got into the issue during direct of these statistics and used the term 95 percent of cumulative accidents and so on. So it came in in their case, not in our case. There was no objection when I put directly, put it on with Mr. Thomas. There was no objection whatsoever. And Plaintiffs won the motion in limine. Now, if you look at Judge Reed's testimony, Judge Reed said that he required substantial similarity, and the only way he let it in was as a basis of an expert's opinion under 703. And if someone wanted an instruction on that, they were entitled to it if they asked. Okay. We're well over. Oh, I'm sorry. It was running up, not running down. I was running up and not running down. I apologize. That's all right. Thank you very much. You're welcome. Very briefly. Number one, on Federal Standard 216, I did submit to Judge Reed for consideration a jury instruction, which, since he had already overruled my objection to it coming in at all, that would put it in some sort of context. And he refused it. I would ask the Court to consider that, because, number one, I didn't think it was relevant. But if they're going to consider it, there ought to be some guidance on how to consider it. So I can't ---- What's your response to the Robinson case? The Robinson case has nothing to do with this. You still have to have relevancy. You don't say, you know, a product complied with 3,000 different standards. Let me tell you what they are when they're not relevant. I mean, there has to be relevancy. Well, why isn't ---- didn't Robinson say that other vehicles, the general experience is relevant to and government standards are relevant to this type of case? If the government standard is relevant to a defense, yes. There was no defense that this product was safe or reasonably safe because it met 216. They didn't introduce any evidence to that effect. None. They didn't put on a witness to say it even complied with 216. Number two, they said that roof crush, which is what 216 judges, isn't relevant to cause quadriplegic injury. There was no relevancy to it. So throwing it up there on the wall had no purpose. Now, on misuse, I've got to go back and make sure the court understands this. It's all predicated upon argument of severity, that it was three rolls. That made it severe. Therefore, it's an unintended misuse of the product. Severity here was based upon this engineer coming in. After we objected to it, they said, for instance, that one of my witnesses mentioned it. This is after we lost our motion to eliminate. We've got to deal with what we know is coming. Okay? It's not the same situation. We presented this and it was overruled. They then come in and say, here are all these rollovers. There are hundreds of thousands of them every year. Most of them are less than one complete revolution. Therefore, by definition, that makes this severe. Severe for what? They didn't know how much roof crush. They were talking about off-road, on-road, dropping from a cliff, whether people are injured or not injured, whether they're belted or not belted. It was just a hodgepodge. What is your answer to his point that he didn't argue on misuse to the jury? Sir, the whole defense here was the severity of this crash, that this is an unintended usage. That was the whole defense. Were those words used? Throughout with their witnesses. But here's what makes it worse, Judge Noonan, is we've got a defense lawyer who's very bright, very bright. He doesn't use those words, but he's got Judge Reed to then tell the jury those exact words. Those exact words. So the whole inference is, look at this, this is a horrible accident. He goes off the road. It rolls over a lot of times. And then Judge Reed throws in the words misuse into the whole mix. You didn't object to that. I sure did. Of course I did. It was overruled. So, again, the point is it doesn't belong in this kind of case. There was no reason for it. This defense verdict was based upon, unfortunately, an application of law that had no place here. And evidence that was completely off the mark. Thank you, sir. Thank you both very much. Thank you. I think we've learned a lot about rollovers this morning. We're going to need to know. The case just argued will be submitted. The Court will adjourn for the day. Thank you. The Court of Dispatch will stand to defer. Thank you.
judges: Reinhardt, Noonan, Paez